[Cite as *State v. Stewart*, 2023-Ohio-1493.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellee,                         :                 No. 22AP-352
                                                                        (C.P.C. No. 21CR-2438)

v.                                                            :

                                                              (REGULAR CALENDAR)

Tangela V. Stewart,                               :

     Defendant-Appellant.                     :

---

D E C I S I O N

Rendered on May 4, 2023

---

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann,* for appellant. **Argued:** *George M. Schumann.*

**On brief:** *Dave Yost*, Attorney General, and *Andrew T. Kielczewski,* for appellee. **Argued:** *Andrew T. Kielczewski.*

---

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} In the midst of a serious global pandemic, personal care aides like defendant-appellant, Tangela V. Stewart, accepted significant risks by continuing to assist their patients with activities of daily living, errands, and household chores. It would have been reasonable for providers to limit risks of exposing their patients and themselves to the novel coronavirus disease (COVID-19) by performing many traditionally in-home services outside of their patients' homes. These risks were particularly rampant in 2020 because there was no approved vaccine or antiviral treatment for COVID-19 at that time.

{¶ 2} It is during this timeframe the plaintiff-appellee, State of Ohio, claims Ms. Stewart committed Medicaid fraud and theft. More precisely, the state accused Ms. Stewart

of seeking and obtaining Medicaid funds for personal care assistance services she did not, in fact, provide to her patient, A.S., in May/June 2020.  Although A.S. repeatedly denied the veracity of these allegations, a Franklin County jury nonetheless found Ms. Stewart guilty of both first-degree misdemeanor offenses on April 21, 2022.

{¶ 3}   Ms. Stewart now appeals from the May 20, 2022 judgment of the Franklin County Court of Common Pleas, arguing her two convictions are against the manifest weight of the evidence.  Because we find she cannot satisfy the exacting requirements to prevail under this difficult standard of review, we must overrule her assignment of error and affirm the trial court's judgment.

## I.  PROCEDURAL BACKGROUND

{¶ 4}   On June 15, 2021, a Franklin County Grand Jury indicted Ms. Stewart with one count of Medicaid fraud, in violation of R.C. 2913.40(B), and one count of theft by deception, in violation of R.C. 2913.02(A)(3).  Both offenses are misdemeanors of the first degree if the value of the funds obtained in violation of either statute is less than $1,000. R.C. 2913.40(E); R.C. 2913.02(B)(2).  The indictment, however, accused Ms. Stewart of unlawfully obtaining between $1,000.00 and $7,499.99 in Medicaid funds for personal care assistance services she did not actually render to her patient, A.S., in 2020. Based on this amount, both offenses were charged as fifth-degree felonies in accordance with their controlling statutory provisions. *See* R.C. 2913.40(E); R.C. 2913.02(B)(2).

{¶ 5}   Following a four-day jury trial, the jury found Ms. Stewart guilty of both offenses on April 21, 2022. The jury also found the aggregate value of the property or services involved in both offenses was less than $1,000. (Tr. Vol. IV at 43-44.) Based on those findings, both offenses were classified as misdemeanors of the first degree.  *See* R.C. 2913.40(E); R.C. 2913.02(B)(2).

{¶ 6}   After the verdict was rendered, the trial court ordered Ms. Stewart to undergo a pre-sentence investigation and revoked her bond. (Tr. Vol. IV at 45.) She was thus incarcerated in the local jail for 29 days while she awaited her sentencing hearing.  (*See* Tr. Vol. IV at 45; Tr. Vol. V at 2.)

{¶ 7}   At Ms. Stewart's May 19, 2022 sentencing hearing, the trial court found the theft and Medicaid fraud offenses merged into a single conviction for purposes of

sentencing, and the state elected to proceed on the Medicaid fraud count. (Tr. Vol. V at 2; May 20, 2022 Jgmt. Entry.) The trial court sentenced Ms. Stewart to a two-year period of community control for that offense. (Tr. Vol. V at 5; Jgmt. Entry.) Among other community control sanctions it imposed, the trial court ordered Ms. Stewart to pay $900[1] in restitution to the Ohio Department of Medicaid and imposed a 180-day local jail sentence, suspending 151 days and crediting the 29 days Ms. Stewart spent in the local jail prior to sentencing. (Jgmt. Entry.)

{¶ 8} Ms. Stewart timely appealed and asserts the following assignment of error for our review:

> THE VERDICTS OF GUILT AS TO MEDICAID FRAUD AND
> THEFT ARE AGAINST THE MANIFEST WEIGHT OF THE
> EVIDENCE.

## II. FACTUAL OVERVIEW

{¶ 9} In 2020, Ms. Stewart was authorized by the Ohio Department of Medicaid ("Department") to render and receive payment for personal care assistance services she provided to Medicaid recipients in their homes. (Tr. Vol. III at 22, 77.) Providers like Ms. Stewart play a vital role in our society because, with their assistance, people with activity-limiting conditions (due to age, medical conditions, or while recovering from an injury) can continue living in their own homes. Personal care assistance services include assisting patients with their daily care (e.g., dressing, bathing, household chores, meal preparation), as well as errands and transportation (e.g., groceries, prescriptions, doctor's appointments). (*See, e.g.*, Tr. Vol. III at 10-11.)

{¶ 10} To be compensated for personal care services provided to Medicaid recipients in Ohio, all providers must be certified and have an active provider agreement with the

---

[1] The jury only found the aggregate value of the property involved was less than $1,000 for both offenses. (*See* Apr. 21, 2022 Verdict Forms.) At the sentencing hearing, the trial court suggested $900 as the restitution amount. (Tr. Vol. IV at 2-3.) Although the record does not indicate the trial court's basis for that amount, the parties nonetheless agreed to it. (*See id.*) Of note, R.C. 2929.28(A)(1) provides, in relevant part, that restitution "shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." Since Ms. Stewart attributes no error to the restitution amount imposed on appeal, however, we must assume all requirements of R.C. 2929.28(A)(1) regarding the imposition and calculation of restitution are satisfied here.

Department. (Tr. Vol. III at 11-16.) These agreements identify a provider's rights and responsibilities under federal and Ohio laws. (Tr. Vol. III at 12-13.)

{¶ 11} Ms. Stewart was under such agreement as a certified "non-agency personal care aide"[2] Medicaid provider. (Tr. Vol. III at 14-22; Trial Ex. 1, 1a.) At all relevant times, Ms. Stewart's payment for such services was thus subject to the terms set forth in her provider agreement with the Department. (*See* Tr. Vol. III at 18-22; Trial Ex. 1A.)

### A. Claim Reimbursement Process and Monitoring

{¶ 12} The Department contracts with managed care companies to supervise, monitor, and process claims related to services provided by personal care aides like Ms. Stewart. (Tr. Vol. III at 22-24.) In 2020, Ms. Stewart contracted as a Medicaid provider with the managed care company, United HealthCare Community Plan. (*See* Tr. Vol. III at 23, 55-56. *See generally* Trial Ex. 3.)

{¶ 13} Under the controlling provider agreement, personal care aides like Ms. Stewart are only reimbursed for medically necessary services. (*See, e.g.*, Tr. Vol. III at 16-20, 27-28.) And they can only bill for services they actually provide to a patient. (*See, e.g.*, Tr. Vol. III at 17, 20-22, 27-28.) Although many personal care assistance services are generally provided by an aide in a patient's home, some of these services must (or can) be provided elsewhere. (*See, e.g.*, Tr. Vol. III at 10-11, 27-29.) Further, the provider agreement does not require aides to provide personal care services at a particular time or at the same time for each patient visit. (*See, e.g.*, Tr. Vol. III at 27-28; *See* Trial Ex. 1 and 1A.) The case manager schedules the services to be provided, and a patient's service plan may specify when services must be provided. (Tr. Vol. III at 28-29.) Of note, A.S.'s services plan from the relevant timeframe was not presented as evidence and her case manager did not testify at trial.

{¶ 14} To receive payment (or reimbursement) for services provided to Medicaid recipients, an aide submits a claim (i.e., bills) to their managed care company. (Tr. Vol. III at 22-24.) Properly submitted claims include, among other things, the provider's unique

---

[2] At trial, the terms "personal care aide," "personal care assistance aide," "personal aide," "home health aide," "health aide," and "nursing aide" were used interchangeably and without distinction. (*See, e.g.*, Tr. Vol. III at 10, 18, 45, 78, 189.)

identifying number,[3] the service date, the patient's name, the procedure (service) code, and the number of units billed by the provider. (*See* Tr. Vol. III at 24-25.) One "unit" equates to a 15-minute increment of service time. (Tr. Vol. III at 61.) Although aides must keep a daily log of services provided to each patient ("timesheets"), nothing in the record suggests they are required to submit these timesheets to their managed care company in order to obtain reimbursement. (*See, e.g.*, Tr. Vol. III at 22-24, 56-65.)

{¶ 15} The Department uses multiple tools to verify reimbursement claims submitted by personal care aides like Ms. Stewart. One is the electronic visit verification ("EVV") system. (Tr. Vol. III at 30-32, 40-43.) For each patient visit, a personal care aide must "call-in" and "call-out" to the EVV system at the start and end of services, thus verifying the duration of the visit (Tr. Vol. III at 31-32.) The EVV system records the GPS coordinates of the location where call-ins and call-outs are made and flags in the "EVV log" when calls are made more than 1,000 feet from a patient's home. (Tr. Vol. III at 32-39.)

{¶ 16} Medicaid also typically requires patients to verify the time and type of services provided during each visit by digital or voice signature in a mobile verification visit application on the provider's cell phone. (Tr. Vol. III at 32, 40-41.) But, that requirement was waived in 2020 due to the COVID-19 pandemic. (Tr. Vol. III at 45.) And although personal care aides were still required to use the EVV system in 2020 (Tr. Vol. III at 45), reimbursement claims were not denied on account of EVV system flags (i.e., the provider calling in or out to the system from a location more than 1,000 feet from a patient's home). (*See* Tr. Vol. III at 39-40.)

{¶ 17} After a managed care company approves a claim, it pays the provider with Medicaid funds. (Tr. Vol. III at 23-24.)

### B. Ms. Stewart's Claim Submissions and Payments in 2020

{¶ 18} This case involves Ms. Stewart's billing and receipt of Medicaid funds for services she allegedly did not provide to Medicaid recipient, A.S., between May 21, 2020

---

[3] As explained at trial by Heather Hire, medical administrator at the Department: "Each Medicaid provider has a unique identifier [number] so that they can bill the department. If they're billing through a managed care company, those claims come into the system using that number." (Tr. Vol. III at 24.)

and July 2, 2020 (the "Service Period").[4] The state became involved in this matter when the Department submitted a referral to the Medicaid Fraud Control Unit of the Ohio Attorney General's Office and requested an investigation into these allegations. (Tr. Vol. III at 76-77.) The lead investigator, Special Agent Steven Braidich, ultimately concluded that she was. As a result, Ms. Stewart was indicted with Medicaid fraud and theft.

{¶ 19} Before describing the basis for the state's allegations against Ms. Stewart, however, it is helpful to lay out some relevant history.

{¶ 20} In 2020, A.S. was in her late 60s and lived alone in a duplex. (Tr. Vol. III at 155-56. *See* Trial Ex. A.) Due to her medical conditions—13 pins in her right foot, spinal stenosis, spondylosis, high blood pressure, and fibromyalgia—A.S. was a Medicaid recipient. (Tr. Vol. III at 159-61.) She had a limited ability to take care of herself, perform household chores, and run errands because of the pain and weakness she endured from these medical conditions. (Tr. Vol. III at 160-61, 187.) A.S. was "basically homebound," rarely had houseguests, and did not have a car. (Tr. Vol. III at 159-61.) Accordingly, prior to and in 2020, A.S. was authorized to receive 19 hours of personal care services per week from a Medicaid provider. (Tr. Vol. III at 162, 165.) At all relevant times, Ms. Stewart provided those services to A.S. (Tr. Vol. III at 162, 174, 190.)

{¶ 21} Of particular significance, the Service Period dates fall within a timeframe when the world was in the midst of a serious global pandemic caused by COVID-19. And vaccines to protect against COVID-19 were not available in Ohio until December 2020.[5] These circumstances unequivocally impacted the ability of personal care aides like Ms. Stewart to perform in-home services for their patients. (*See, e.g.*, Tr. Vol. III at 45, 121-22, 195-97, 203-04, 208.) Continuing to provide these services meant Ms. Stewart risked becoming infected and infecting her patients, many of whom are immunocompromised and elderly. At the same time, patients like A.S. continued to require assistance with activities of daily living, household chores, and errands.

---

[4] The service dates at issue in this case are May 20, 2020 through June 23, 2020. (*See* Trial Ex. 5, 7.) Ms. Stewart received payment (i.e., Medicaid funds) for these service dates between May 30, 2020 and July 2, 2020. (*See id.*) "Service Period" generally pertains to the former, but also encompasses the latter as it relates to the dates on which Ms. Stewart received payment for the relevant service dates.

[5] *COVID-19 Update: Vaccinations Begin in Ohio*, Office of the Governor, STATE OF OHIO (Dec. 14, 2020), https://governor.ohio.gov/media/news-and-media/covid19-update-12142020. (accessed May 2, 2023).

{¶ 22} To limit the exposure risks inherent in providing personal care services in close contact, providers like Ms. Stewart looked for alternative ways to safely provide the personal care services traditionally performed in patients' homes.[6]  This often meant preparing meals or doing laundry outside of the patient's home.  (*See, e.g.*, Tr. Vol. III at 10-11, 124-28, 170-71, 184-85, 194-99.)  Indeed, Ms. Stewart testified she was directed by her managed care agency to maintain social distancing when providing services to her patients in 2020.  (*See* Tr. Vol. III at 203-04.)  Further, the limited availability of items in stores, in addition to modified store hours, required personal care aides like Ms. Stewart to devote longer (or different) periods of time to performing errands for their patients.  (*See* Tr. Vol. III at 196-201, 208.)  And, of note, A.S. contracted COVID-19 during the Service Period.  (Tr. Vol. III at 191, 196-97, 200-03.)  These circumstances frame our analysis in this case.

{¶ 23} Evidence and testimony at trial established three general uncontested facts central to our evaluation of Ms. Stewart's manifest weight challenge.

{¶ 24} First, Ms. Stewart billed her managed care company for either 12 units or 8 units of "personal care service, per 15 minutes" provided to A.S. daily between May 20, 2020 and June 23, 2020.  (Tr. Vol. III at 66-72; Trial Ex. 3, 5, 7.)  This equates to either 3 hours (12 units) or 2 hours (8 units) of personal care services per day, and 92 hours in total for the entire Service Period.  (Trial Ex. 3, 5.)  Of note, Ms. Stewart did not bill for more than the approved 19 hours of service per week during the Service Period.  (Tr. Vol. III at 66-72; Trial Ex. 3, 7.)

{¶ 25} Second, between May 30, 2020 and July 2, 2020, Ms. Stewart received $1,362.10 in Medicaid funds for the 92 hours of personal care aide services she claimed (in her Medicaid reimbursement submissions) she provided to A.S. during the Service Period.  (Trial Ex. 3, 7.)  Of that amount, the state claimed $1,314.53 in Medicaid funds were paid to Ms. Stewart for services that were not actually rendered to A.S.  (Trial Ex. 7; Tr. Vol. III

---

[6] Indeed, recognizing these risks, Governor DeWine issued additional executive orders that closed facilities providing older adult daycare services and senior centers (effective Mar. 23, 2020) and generally relaxed or amended administrative rules pertaining to, among other things, healthcare providers' ability to render aid. *See, e.g.*, Laura A. Bischoff & Kristen Spicker, *Coronavirus Timeline: A Look at the Orders Changing Life in Ohio*, DAYTON DAILY NEWS (May 13, 2020), https://www.daytondailynews.com/news/local/timeline-coronavirus-prompts-orders-changing-everyday-life-ohio/gpnVSADPxZxMltlDVyqKEP/. (accessed May 2, 2023)

at 111-13, 138-39.)  The state did not carry its burden on that full amount, however, because the jury found the unlawfully obtained amount involved in both offenses was less than $1,000.  (Apr. 21, 2022 Verdicts 1(B) and 2(B); Tr. Vol. IV at 43-44.)

{¶ 26} Finally, the continuously recording surveillance camera trained on A.S.'s residence during the Service Period showed Ms. Stewart at A.S.'s home for less than 15 minutes each day.  (*See, e.g.*, Tr. Vol. III at 93-94, 111-12, 125-27; Trial Ex. 4, 5.  *See also* Tr. Vol. II at 157-62.)  More precisely, Special Agent Braidich's unrefuted testimony established that the surveillance camera captured Ms. Stewart at A.S.'s home for approximately 3.75 hours, in total, during the entire Service Period.  (Tr. Vol. III at 84-93; Trial Ex. 5.  *But see* Tr. Vol. III at 118-19, 125-27, 130-31, 138-40.)  The surveillance camera also generally showed Ms. Stewart's vehicle at A.S.'s home in the mornings.  (*See* Trial Ex. 4, 5.)

{¶ 27} The state's case rested primarily on these three pieces of evidence and the predicate assumption that personal care services were only provided at A.S.'s residence. Under this framework, the state's argument on appeal is simple: because the surveillance footage showed Ms. Stewart at A.S.'s home approximately 3.75 hours, in total, between May 20, 2020 and June 23, 2020, "the jury properly concluded that [Ms. Stewart] was not providing the proper amount of services for which she billed" and was paid, i.e., 92 hours. (*See* Appellee's Brief at 13.)

{¶ 28} But, providing personal care services exclusively in a patient's home is not the standard for reimbursement, and this was particularly true during the Service Period given the ongoing global pandemic.  (*See, e.g.*, Tr. Vol. III at 45, 121-22, 196-97.)  Indeed, Ms. Stewart testified at trial that most of the hours she billed during the Service Period were for out-of-home services she provided to A.S. (meal prep, grocery shopping, laundry, supplies, etc.). (Tr. Vol. III at 192-204.)  A.S.'s trial testimony also corroborated Ms. Stewart running errands for her during the Service Period. (Tr. Vol. III at 136-37, 170-71.) And, the surveillance camera footage was generally consistent with (or at least generally did not refute) Ms. Stewart's account of running errands and performing tasks outside of the home for A.S., and then coming to A.S.'s home to drop off prepared food, laundry, groceries, prescriptions, or the like.  (*See* Tr. Vol. III at 192-201; Trial Ex. 5.)

{¶ 29} Ms. Stewart's car was observed on the surveillance footage at A.S.'s home all but three days during the Service Period.  (*See* Tr. Vol. III at 87-93, 105-07, 127-31; Trial

Ex. 5.) The surveillance camera also captured Ms. Stewart's vehicle briefly sitting outside of A.S.'s home and then departing without anyone having entered or exited the vehicle on three other days. (*See* Ex. 5; Tr. Vol. III at 88-89, 178-80.) Special Agent Braidich conceded he had no information about conversations between Ms. Stewart and A.S. (either on the phone or the day before) concerning errands or tasks A.S. needed assistance with on any particular day. (*See* Tr. Vol. III at 122-31.) Nor could Special Agent Braidich refute the possibility that, even on the days when Ms. Stewart's vehicle was not observed at A.S.'s home or sat idle in A.S.'s driveway, Ms. Stewart was performing personal care services that she and A.S. had discussed over the phone or the day before. (*See* Tr. Vol. III at 122-31.) To be sure, Ms. Stewart and A.S. both testified about having service-related phone conversations during the Service Period—undoubtedly, a necessary means to accommodate social distancing guidelines in effect at that time. (*See* Tr. Vol. III at 170-71, 184, 201-04.)

{¶ 30} Special Agent Braidich's uncertainty about these matters stemmed from the fact that the surveillance camera was pointed at A.S.'s front door—which A.S. never used. (Tr. Vol. III at 85-87, 158.) A.S. testified that she and her guests almost always entered and exited her home through the back door. (Tr. Vol. III at 158-59.) But, the backyard, back door, and side door of A.S.'s home were not visible due to the surveillance camera's angle. (Tr. Vol. II at 168; Tr. Vol. III at 84-86, 120. *See* Tr. Vol. III at 157-59; Trial Ex. A, B.) And no surveillance was conducted on the back entrance to A.S.'s home during the relevant timeframe. (Tr. Vol. III at 120. *See* Trial Ex. 5.)

{¶ 31} This is significant because Ms. Stewart typically parked in A.S.'s backyard near the back door. (*See* Tr. Vol. III at 120-31; Trial Ex. 5.) When this happened, the surveillance camera did not capture whether Ms. Stewart exited the car, A.S. came out to the car, or if any items were carried into or out of A.S.'s home. (*See* Tr. Vol. III at 120-31; Trial Ex. 5.) No surveillance was contemporaneously conducted on what Ms. Stewart was doing when she was not at A.S.'s home. (*See, e.g.*, Tr. Vol. III at 120-21, 126-31. *See also* Tr. Vol. II at 168.) As a result, the state did not present evidence unequivocally showing that Ms. Stewart was not, for instance, running errands or at her own home preparing food for A.S. during any billed service timeframe. (*See, e.g.*, Tr. Vol. III at 120-31.) Thus, at trial, Special Agent Braidich acknowledged it was possible Ms. Stewart dropped off groceries, did laundry, prepared meals, or delivered prescriptions for A.S. when her vehicle was observed

at A.S.'s home on most of the days during the Service Period. (*See* Tr. Vol. III at 123-27; Trial Ex. 5.) But, because of its positioning, the surveillance camera had no ability to capture this.

### C. Ms. Stewart's Timesheets

{¶ 32} Sometime after the surveillance period ended, Special Agent Braidich served Ms. Stewart with a subpoena requesting she provide him with all documentation and timesheets she maintained for her Medicaid patients. (Tr. Vol. III at 94-95.) On April 28, 2021, Ms. Stewart produced those documents. (Tr. Vol. III at 95-96.) Special Agent Braidich noted that timesheets are "a common occurrence in the world of home health care" and that Ms. Stewart used what appeared to be a "standard timesheet" typical of the ones he usually reviews during his investigations. (Tr. Vol. III at 96-97.)

{¶ 33} Along with the date, time-in, time-out, patient name, and service provider, the timesheets included boxes to "check" the services performed during each shift. (Tr. Vol. III at 97; Trial Ex. 6, C.) Ms. Stewart's timesheets for the Service Period were admitted into evidence and discussed extensively at trial. (Trial Ex. 6, C.) She testified that she completed these timesheets daily (Tr. Vol. III at 203), and Ms. Stewart and A.S. both attested to their accuracy (*see* Tr. Vol. III at 138, 162-70, 174-76, 181-82, 191-93, 202-05).

{¶ 34} A.S. testified that Ms. Stewart provided 19 hours of personal care services to her each week during the Service Period. (Tr. Vol. III at 162-66.) After speaking with her case manager, Heather Garrett—who did not testify at trial—A.S. believed she and Ms. Stewart could coordinate when the 19 hours of services were provided. (Tr. Vol. III at 165-66, 175.) Unrefuted evidence and testimony thus established Ms. Stewart was permitted to provide personal care services to A.S. at varying times during the Service Period for up to 19 hours each week. (*See* Tr. Vol. III at 165-66.)

{¶ 35} Ms. Stewart's timesheets indicated she performed the following personal care services during the Service Period: changing bedding, making the bed, kitchen cleaning, bathroom cleaning, and vacuuming/dusting. (Trial Ex. 6, C. *See also* Tr. Vol. III at 103-04.) Nearly all of these services could only be performed in A.S.'s home. (Tr. Vol. III at 103-04; Trial Ex. 6.) Ms. Stewart testified she completed the exclusively in-home services within minutes during the Service Period. (Tr. Vol. III at 194.) That testimony was generally

consistent with the surveillance camera footage showing Ms. Stewart at A.S.'s home for less than 15 minutes per day. (*See* Trial Ex. 4, 5.)

{¶ 36} Ms. Stewart also described providing personal care services to A.S. at times other than those listed on her timesheets. (Tr. Vol. III at 195-96, 208-09. *See also* Tr. Vol. III at 174-76.) But the surveillance camera only twice captured Ms. Stewart's vehicle coming and going from A.S.'s home multiple times in a single day during the Service Period. (*See* Trial Ex. 4, 5. *See also* Tr. Vol. III at 128-33, 195-96. *Compare with* Tr. Vol. III at 99.) Relatedly, Special Agent Braidich described Ms. Stewart's timesheet hours as exactly matching the EVV "clock-in" and "clock-out" data. (Tr. Vol. III at 98. *Compare* Trial Ex. 6, *with* Trial Ex. 2.) In other words, the EVV system data also did not show Ms. Stewart calling in or out at times other than those listed on her timesheets. (*See* Trial Ex. 2.)

{¶ 37} From these circumstances, three points jump out. *First*, Ms. Stewart billed 92 service hours (2 or 3 hours each day) during the Service Period. (Trial Ex. 7; Tr. Vol. III at 191.) *Second*, the surveillance footage showed Ms. Stewart at A.S.'s home approximately 3.75 hours during the entire Service Period. (*See* Tr. Vol. III at 97-99, 103-07; Trial Ex. 4, 5.) *Third*, unrefuted evidence established that on at least 6 days during the Service Period, Ms. Stewart did not go into A.S.'s home, meaning she did not perform any of the exclusively "in-home" services checked off on her timesheets for those corresponding days. (*Compare* Trial Ex. 6 *with* Trial Ex. 5.) These points add up to the conclusion that approximately 88.25 service hours were unaccounted for in Ms. Stewart's timesheets and the surveillance footage of A.S.'s home during the Service Period.

{¶ 38} To account for these hours, Ms. Stewart testified about the errands and services she performed for A.S. outside of A.S.'s home. (*See* Tr. Vol. III at 194-205.) A.S. generally corroborated that Ms. Stewart sometimes performed out-of-home services for her. (*See* Tr. Vol. III at 170-71, 184-85.) But, Ms. Stewart never checked the "Groceries/Errands" boxes on any of her timesheets from the Service Period. (Tr. Vol. III at 104, 140, 203-05; Trial Ex. 6, C.)

{¶ 39} Ms. Stewart also testified about returning to A.S.'s home in the afternoons or evenings to perform additional services (e.g., taking trash can to the curb) or to drop off items she picked up for A.S. while running errands. (Tr. Vol. III at 194-96.) The surveillance

footage from the Service Period did not, however, corroborate those claims. (*See* Tr. Vol. III at 99, 128-31; Trial Ex. 4, 5)

{¶ **40**} Ms. Stewart explained that her timesheets from the Service Period did not reflect all of the services she provided to A.S. because some of the services she performed outside of A.S.'s home were not listed on the timesheets. (*See* Tr. Vol. III at 194-201; Trial Ex. 6, C.) We note the timesheet forms generally delineate tasks that could only be performed in a patient's home. (*See* Trial Ex. 6, C.) They do not expressly itemize tasks like meal prep, laundry, travel time, or other personal care assistance services that ***could be*** (but, unlike errands and appointments, were not necessarily required to be) performed outside of a patient's home. (*Compare* Trial Ex. 6 *with* Tr. Vol. III at 197-99.) The timesheets do list "Groceries/Errands" as a personal care service task. (Trial Ex. 6, C.) But, the box pertaining to this task was not checked for any service date on Ms. Stewart's timesheets from the Service Period. (*See* Trial Ex. 6, C.)

{¶ **41**} Significantly, Ms. Stewart did not—and was not required to—submit her timesheets to United HealthCare Community Plan in order to obtain reimbursement for services she provided. (*See, e.g.*, Tr. Vol. III at 22-25, 58- 65.) Ms. Stewart's timesheets were not provided to anyone (other than for A.S. to sign and return to Ms. Stewart) until April 2021, when she produced them for Special Agent Braidich in response to his subpoena. (*See* Tr. Vol. III at 94-96, 162-69.)

{¶ **42**} We do recognize that, under the controlling provider agreement, Ms. Stewart was obligated to maintain, for at least six years, "all records necessary and in such form so as to fully disclose the extent of services provided and significant business transactions." (Trial Ex. 1A at 5. *See* Tr. Vol. III at 205-06.) We emphasize, however, a Medicaid provider's failure to accurately document the services performed each day on timesheets does not, in and of itself, prove personal care assistance services were not provided to a patient. (*See, e.g.*, Tr. Vol. III at 143.) On that point, it is significant to note that A.S. told the special agents and testified at trial that Ms. Stewart performed services for her during all of the billed service hours. (*See* Tr. Vol. III at 134-38, 162-73, 176, 182, 184-85.) A.S. never claimed Ms. Stewart failed to meet her needs. As a result, the state's case rested primarily on inferences about several pieces of inconsistent and irreconcilable evidence and testimony presented at trial.

## III.  LEGAL ANALYSIS

{¶ 43} In her first and sole assignment of error, Ms. Stewart argues her convictions are against the manifest weight of the evidence.  We must disagree.

### A.  Standard of Review

{¶ 44} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion.  *See, e.g.*, *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13 and *State v. Thompkins*, 78 Ohio St.3d 380, 386-87 (1997). "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis."  *State v. Walker*, 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43.  "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis omitted.) *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See also Mid Am. Constr., LLC v. Univ. of Akron*, 10th Dist. No. 18AP-846, 2019-Ohio-3863, ¶ 21.

{¶ 45} A judgment is not against the manifest weight of the evidence if it is "supported by some competent, credible evidence[.]" *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).  In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *See, e.g.*, *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10, citing *Eastley* at ¶ 20, citing *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  *See also State v. Martin*, ____ Ohio St.3d ____, 2022-Ohio-4175,¶ 26.

{¶ 46} Accordingly, when considering an appellant's claim that a conviction is against the manifest weight of the evidence, a court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also Martin*, 2022-Ohio-4175 at ¶ 26.  At the same time, we must remain mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess.  *See, e.g.*, *State v.*

*DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-131, 2021-Ohio-3803, ¶ 64, quoting *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *See also State v. Brightwell*, 10th Dist. No. 18AP-243, 2019-Ohio-1009, ¶ 33.

{¶ 47} This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact, *DeHass* at paragraph one of the syllabus, and the trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67 (1964). Accordingly, "judgments 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.' " *Morris* at ¶ 64, quoting *Meccon, Inc. v. Univ. of Akron*, 10th Dist. No. 12AP-899, 2013-Ohio-2563, ¶ 15, citing *Watson* at ¶ 31, citing *C.E. Morris* at syllabus. *See also State v. Moore*, 10th Dist. No. 19AP-464, 2021-Ohio-1379, ¶ 67, citing *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387.

{¶ 48} Further, to reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### B. Applicable Law

{¶ 49} Our analysis of Ms. Stewart's manifest weight challenge is limited to the Medicaid fraud offense. This is because the trial court merged the theft and Medicaid fraud offenses at sentencing.[7] *See State v. McKinney*, 10th Dist. No. 08AP-23, 2008-Ohio-6522, ¶ 44. *See also State v. Kpoto*, 10th Dist. No. 19AP-492, 2020-Ohio-3866, ¶ 13, 16-21.

{¶ 50} The Medicaid fraud statute prohibits a person from "knowingly mak[ing] or caus[ing] to be made a false or misleading statement or representation for use in obtaining

---

[7] If we found Ms. Stewart's Medicaid fraud conviction to be against the manifest weight of the evidence, however, we would also evaluate the evidence underlying the theft offense. Such additional analysis is not necessary in this case.

reimbursement from the medicaid program." R.C. 2913.40(B).

{¶ 51} We have recognized that "[t]he gravamen of the offense is the making of a false or misleading statement or representation for use in obtaining Medicaid reimbursement with knowledge that the statement is false or misleading." *State v. Vogelsong*, 82 Ohio App.3d 354, 361 (10th Dist.1992). And, to obtain a Medicaid fraud conviction, the state must prove it was "improper" for the service provider to bill for such services. *See, e.g.*, *State v. Brown*, 99 Ohio App.3d 604, 608 (10th Dist.1994). Billing for services not provided is improper. (*See, e.g.*, Tr. Vol. III at 17, 20-21; Trial Ex. 1A at 4.)

{¶ 52} Furthermore, the provider must have knowingly engaged in this conduct. *See Vogelsong* at 361. A person acts "knowingly, regardless of [her] purpose," when she is aware that her conduct "will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id*.

### C. Evaluation of Ms. Stewart's Manifest Weight Challenge

{¶ 53} The state accused Ms. Stewart of unlawfully obtaining money from the Department by requesting and obtaining payment for personal care assistance services she did not actually render to A.S. In direct contravention to the state's allegations, however, A.S. maintained in her interview with special agents and trial testimony that Ms. Stewart provided all of the 92 billed service hours during the Service Period. (*See* Tr. Vol. III at 134-38, 165-66.) The state's case thus rested primarily on inferences that could be made about inconsistent evidence and testimony presented at trial.

{¶ 54} On appeal, Ms. Stewart concedes there is some inconsistency between the type of services Ms. Stewart (and, to some extent, A.S.) testified were provided and the type of services Ms. Stewart recorded on her timesheets. (Appellant's Brief at 22.) Ms. Stewart argues on appeal that "inconsistent or inaccurate timesheets as to the type of services that were provided is not the gravamen for the offense of Medicaid fraud." (Appellant's Brief at 22.) We generally agree. But, we are not the jury. And, in this case, the jury found the state proved beyond a reasonable doubt that Ms. Stewart knew she requested reimbursement for more hours than she actually worked. It also found Ms. Stewart made these false or

misleading representations in the reimbursement claims (billing) she submitted to United HealthCare Community Plan with the purpose to obtain Medicaid reimbursement for some amount less than $1,000, knowing she was not lawfully entitled to that amount. (*See* Apr. 21, 2022 Verdict Forms.) Our role is to decide whether those findings are supported by competent, credible evidence.

{¶ 55} Ms. Stewart did not, and was not required to, submit her timesheets to obtain reimbursement for the services she provided. And we acknowledge Ms. Stewart presented evidence at trial that, if believed, may have accounted for all of the billed hours of service during the Service Period—that being 3.75 in-home service hours and 88.25 out-of-home service hours. Further, the state generally agrees a Medicaid provider can properly bill for personal care services rendered outside of a patient's home, and we believe this to be particularly true in the midst of a global pandemic.

{¶ 56} To be sure, the Ohio Administrative Code contemplates—and certainly does not prohibit—a personal care aide from providing personal care services outside of a patient's home. It states that "personal care activities" provided by a personal care aide can include:

1. Assisting the individual with managing the home, handling personal affairs, and providing assistance with self-administration of medications, as defined in rule 173-39-01 of the Administrative Code.

2. Assisting the individual with [activities of daily living (ADL), as defined in Ohio Adm.Code 5160-3-05(B)(2)] and [instrumental activities of daily living (IADL), as defined in Ohio Adm.Code 5160-3-05(B)(17)].

3. Homemaker activities listed in rule 173-39-02.8 of the Administrative Code when those activities are specified in the individual's service plan and are incidental to the activities in paragraphs (A)(1) and (A)(2) of this rule or are essential to the health and welfare of the individual rather than the individual's family.

4. Providing respite services to the individual's caregiver.

5. Providing an errand outside of the presence of the individual that is needed by the individual to maintain the individual's health and safety (e.g., picking up a prescription or groceries for the individual).

Ohio Adm.Code 173-39-02.11(A). *See also* Ohio Adm.Code 173-39-01(B).

{¶ 57} We therefore conclude that, at all relevant times and particularly during the pandemic, Ms. Stewart was permitted to bill for services she performed for A.S. outside of A.S.'s home. For these reasons, we do not find the GPS location data from the EVV system—which generally showed Ms. Stewart "calling in" at her own home and "calling out" at A.S.'s home—to be relevant, competent, or credible evidence of improper billing under the facts and circumstances of this case. (*See* Tr. Vol. III at 79-83; Trial Ex. 9A, 9B.)

{¶ 58} We also note that "meal preparation," "personal laundry," and "shopping" are all expressly enumerated as "instrumental activit[ies] of daily living" that a personal care aide can provide to a patient and seek reimbursement for under the Ohio Administrative Code. *See* Ohio Adm.Code 5160-3-05(B)(17); Ohio Adm.Code 173-39-02.11(A)(2); Ohio Adm.Code 173-39-01(B). And Ms. Stewart presented evidence that she provided these types out-of-home services to A.S. during the Service Period, and, more broadly, that she performed all hours of service for which she billed and was paid. (*See* Tr. Vol. III at 169-76, 191-205.) However, there was also evidence to the contrary presented through the timesheets, the testimony of A.S. and Ms. Stewart about these timesheets, the surveillance camera footage, and Special Agent Braidich's testimony about his investigation.

{¶ 59} Ms. Stewart testified she completed all timesheets daily—i.e., contemporaneously with when the services were provided. (Tr. Vol. III at 191, 203-04.) And Ms. Stewart and A.S. both testified these timesheets were accurate. (*See* Tr. Vol. III at 138, 162-70, 174-76, 181-82, 191-93, 202-05.) All timesheets were signed by Ms. Stewart and A.S. (Tr. Vol. III at 137, 162-70, 191-93; Trial Ex. 6, C.) A.S. said she reviewed all of Ms. Stewart's completed timesheets for accuracy at the end of each service week before she signed them. (Tr. Vol. III at 162-70. *See also id.* at 191.) We note her signature is on all timesheets from the Service Period, which, taken with her testimony about signing them, meant A.S. verified their accuracy shortly after services were provided. (*See* Trial Ex. 6, C.)

{¶ 60} Indeed, A.S. testified at trial that the timesheets accurately depicted the

duration and type of services Ms. Stewart provided to her during the Service Period. (*Compare* Tr. Vol. III at 174, 182, 203, *with* Tr. Vol. III at 195.) But, nearly all of the services Ms. Stewart checked on those timesheets were services that could only be performed in A.S.'s home. (*See* Trial Ex. 6, C.) And the surveillance camera footage only supported approximately 3.75 "in-home" service hours during the Service Period. (Trial Ex. 5.)

{¶ 61} To reconcile billing 2-3 service hours each day with the surveillance camera footage showing Ms. Stewart at A.S.'s home 0-15 minutes per day, Ms. Stewart claimed most of the billed service hours pertained to errands and tasks she performed for A.S. outside of A.S.'s home during the Service Period. (*See* Tr. Vol. III at 194-205.) And A.S. generally recalled Ms. Stewart occasionally performing some services outside of A.S.'s home. (*See* Tr. Vol. III at 170-71, 184-85.) But Ms. Stewart did not check boxes on any of her timesheets for most of the out-of-home services she testified to providing during the Service Period.[8] (*See* Trial Ex. 6, C.)

{¶ 62} Ms. Stewart never checked the "Groceries/Errands" boxes on any of the timesheets from the Service Period. (Tr. Vol. III at 104-05, 140, 203-05; Trial Ex. 6, C.) The reason, she explained, was because "[i]f [she] couldn't find something [at the store] that day, there wasn't no [sic] sense in checking it off." (Tr. Vol. III at 203.) In the same sentence, she also claimed it "was just an honest mistake" that occurred because she was "really tired," "burned out in 2020," and "all over the place trying to make sure [A.S.] had what she needed and what she wanted." (Tr. Vol. III at 203.) However, both A.S. and Ms. Stewart undermined this testimony because they repeatedly testified the timesheets were accurate. (Tr. Vol. III at 163, 174-76, 182, 191-92, 202-05.) We acknowledge Ms. Stewart subsequently modified her testimony when she claimed her timesheets omitted most of the out-of-home errands and services she provided to A.S. during the Service Period. (Tr. Vol. III at 202-05.) Yet, that testimony was undermined by testimony from the defense's own witness, A.S., who affirmed the accuracy of the timesheets in their entirety—including the depiction of the type of services Ms. Stewart performed each day during the Service Period.

---

[8] We acknowledge the "Change Bedding" task on the timesheets could pertain to laundry services performed outside of A.S.'s home. (*See* Trial Ex. 6, C.) And, Ms. Stewart testified about going to a commercial laundromat to clean some of A.S.'s soiled bedding. (Tr. Vol. III at 196-98.) But, the "Change Bedding" service was checked off on the timesheets for just five service dates during the entire Service Period. (*See* Trial Ex. 6, C.)

(Tr. Vol. III at 182.) In other words, A.S. did not testify the timesheets failed to reflect the out-of-home services Ms. Stewart provided to her during the Service Period.

{¶ 63} Ultimately, this case comes down to the irreconcilable differences between the testimony of Ms. Stewart and A.S. and the tangible evidence presented at trial. We reiterate the foundational principle that in a criminal prosecution, the state must prove every element of an offense beyond a reasonable doubt and the defendant is not required to disprove any essential element of the offense. *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). With that foundational principle in mind, we are thus leery to say Ms. Stewart's failure to check the "Groceries/Errands" box (or to create a new box) on timesheets she is not required to submit for reimbursement, alone, is competent, credible evidence of Medicaid fraud or theft. While Ms. Stewart may have been required to create and maintain accurate, contemporaneous timesheets to retain her status as a certified Medicaid provider, her failure to do so does not necessarily mean she committed a criminal offense. We certainly caution against resting a Medicaid fraud or theft conviction on merely inaccurate timesheets or a provider's inability to affirmatively show, years later, that all billed services were actually rendered. We also have limited confidence in the ability of a patient—who did not claim her Medicaid provider failed to render any services—to competently testify that her provider's timesheets from years earlier accurately describe the duration and type of services provided on particular days.

{¶ 64} Under different facts and circumstances than those presented here, this type of evidence, alone, might not suffice as competent, credible evidence of Medicaid fraud. But, since the source of these inconsistencies is largely derived from the testimony of defense witnesses—Ms. Stewart and A.S.—we decline to find these concerns bear on our analysis of the manifest weight challenge raised in this case.

{¶ 65} Furthermore, to convict Ms. Stewart of first-degree misdemeanor Medicaid fraud, the jury only had to find the state proved, beyond a reasonable doubt, that Ms. Stewart knowingly made false or misleading representations about the services she provided in order to obtain Medicaid reimbursement in ***any amount*** less than $1,000. *See* R.C. 2913.40(B), (E). To satisfy its burden, the state only needed to prove Ms. Stewart did not do ***some*** of the work she was paid for during the Service Period—not ***all.***

{¶ 66} With this in mind, we find the unrefuted evidence regarding six particular

days of the Service Period fatal to Ms. Stewart's manifest weight challenge. That evidence proved, beyond a reasonable doubt, that Ms. Stewart did not go to A.S.'s home at all on at least three days (May 29, June 4, and June 15) and drove to, but did not enter, A.S.'s home on at least three others (May 23, May 30, and June 14). (*See* Trial Ex. 5.) Yet, Ms. Stewart indicated in her timesheets for these six services dates she performed services that could only be completed in A.S.'s home. (*See* Trial Ex. 6, C.) On the three days Ms. Stewart only drove to A.S.'s home, the surveillance footage showed no one entering or exiting her vehicle. (*See* Trial Ex. 5.) So, the state also proved, beyond a reasonable doubt, that at least on these six days, Ms. Stewart did not take A.S. anywhere, drop anything off for A.S. (e.g., groceries), or receive anything from A.S. (e.g., dirty laundry). (*See* Trial Ex. 5.)

**{¶ 67}** Ms. Stewart represented that she worked 15 service hours on these six days, and, as a result, she was paid accordingly. (*See* Trial Ex. 7.) Based on the evidence, however, those services hours could only be derived from out-of-home services provided. On her timesheets for all of these six days, Ms. Stewart did not check the boxes for out-of-home services. (Trial Ex. 5.) Nonetheless, A.S. testified the services Ms. Stewart indicated on her timesheets were accurate portrayals of the services she actually received on all days during the Service Period, including these six. (Tr. Vol. III at 163-64, 174-76, 182.) For these reasons, we find it was certainly within the province of the jury to infer services were not provided (at least on some or all of these six service dates) based on this evidence, the trial testimony, and the jury's evaluation of the credibility of the witnesses who testified at trial.

**{¶ 68}** It is true that the trial witnesses and evidence showed uncertainty concerning whether and for what duration Ms. Stewart performed personal care services for A.S. outside of A.S.'s home during the Service Period. Nonetheless, based on the foregoing, and given the exacting standard of review to which our analysis of Ms. Stewart's manifest weight challenge must be confined, we find there is substantial competent and credible evidence to support Ms. Stewart's Medicaid fraud conviction. Accordingly, we find the jury's verdict was not against the manifest weight of the evidence and overrule Ms. Stewart's sole assignment of error.

## IV. CONCLUSION

{¶ 69} Having overruled Ms. Stewart's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.

———————————