[Cite as *State v. Kpoto*, 2020-Ohio-3866.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-492 |
| v. | : | (C.P.C. No. 18CR-1837) |
| Sekou B. Kpoto, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

_____

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-519 |
| v. | : | (C.P.C. No. 18CR-1839) |
| Caritas Home Healthcare & | : | (REGULAR CALENDAR) |
| Supported Living, LLC, | | |
| | : | |
| Defendant-Appellant. | | |
| | : | |

D E C I S I O N

Rendered on July 28, 2020

**On brief:** *Jeremy A. Roth*, for appellants. **Argued:** *Jeremy A. Roth.*

**On brief:** *Dave Yost*, Attorney General, *Andrew T. Kielczewski*, and *Susan R. Schultz*, for appellee. **Argued:** *Andrew T. Kielczewski.*

APPEALS from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} The two above-captioned criminal matters involve a health care company and its principal owner, each having been prosecuted separately and under separate case

numbers before the Franklin County Court of Common Pleas.  Because these matters were tried before a jury together, involved coordinated sentencing, appealed at the same time, and briefed nearly identically, we render a single decision after having reviewed both appeals.

{¶ 2}  Defendant-appellant, Sekou B. Kpoto, and defendant-appellant, Caritas Home Healthcare & Supported Living, LLC, appeal judgments of the Franklin County Court of Common Pleas issued on July 12, 2019 following a jury trial, convicting each of them of one count of Medicaid fraud and sentencing both of them to three years of community control.  We overrule Kpoto's and Caritas' assignment of error and affirm the trial court's judgments because the evidence in this case showed that Kpoto, owner and president of Caritas, knew that he was required to transport his passengers in a wheelchair, knew that he was not doing so, and either actually knew that Caritas was billing these trips to Medicaid or at least believed that was so and failed to carry out his responsibilities under the law.

## I.  FACTS AND PROCEDURAL POSTURE

{¶ 3}  On April 17, 2018, a Franklin County Grand Jury indicted Kpoto and his company, Caritas, each for one count of Medicaid fraud and one count of grand theft by deception.  (Apr. 17, 2018 Indictment 18CR-1837; Apr. 17, 2018 Indictment 18CR-1839.)  Kpoto and Caritas pled "not guilty" and these matters proceeded to an informally consolidated trial.  (May 2, 2018 Plea Form 18CR-1837; May 2, 2018 Plea Form 18CR-1839.)

{¶ 4}  The first witness to testify in this single trial of both defendants was a supervisor of provider compliance with the Ohio Department of Medicaid.  (Tr. Vol. I at 18.)[1]  The supervisor testified that an entity that obtains a provider agreement with the Ohio Department of Medicaid may bill Medicaid for services rendered.  (Tr. Vol. I at 20.)  Caritas enrolled as a sole proprietorship wheelchair van provider on February 26, 2013 and listed Kpoto as the contact.  (Tr. Vol. I at 30-35; State's Ex. 1 at 1-7.)  As part of the provider agreement, Caritas agreed to provide only necessary services and bill them at the usual and customary rate.  (Tr. Vol. I at 34; State's Ex. 1 at 7.)  The supervisor stated that, in general,

---

[1] The first and second volumes of the trial transcript as well as associated exhibits were filed in Franklin County Court of Common Pleas case No. 18CR-1837 on August 28, September 4, and September 13, 2019, respectively.  Due to the non-consecutive pagination of the transcript volumes, we cite each by reference to its volume number and page number.

the Ohio Department of Medicaid relies on the honesty of participants to determine whether a claim submitted is accurate and truthful. (Tr. Vol. I at 36.)

{¶ 5} The next witness to testify was an external audit manager for the Ohio Department of Medicaid. (Tr. Vol. I at 41.) She testified that approximately every two years, her group sends a survey to ambulette (wheelchair van) providers such as Caritas to confirm information it has about the company and to provide education to the company about Medicaid policies. (Tr. Vol. I at 42-43.) Such a survey was sent to Caritas and apparently completed and signed by Kpoto on May 19, 2014. (Tr. Vol. I at 45, 49-50; State's Ex. 11 at 10.) In that document, Kpoto indicated that he was aware that, in order for an ambulette transport to be covered by Medicaid, the individual being transported must actually be nonambulatory and transported in a wheelchair. (Tr. Vol. I at 46-47; State's Ex. 11 at 5.) Kpoto wrote that he became aware of this requirement on February 26, 2013. (State's Ex. 11 at 5.) Kpoto also stated that, as of 2013, he was aware of the requirement that, if an attendant is used in addition to the driver of the ambulette (or wheelchair van), the circumstances must be extraordinary and there must be documentation supporting the need and use of the attendant. *Id.* at 6. Kpoto's survey response indicated confusion, however, about the requirement that he have on file a Certificate of Medical Necessity signed by the authorized attending practitioner for the individual being transported. *Id.* Kpoto also wrote, during the survey, that Caritas "ONLY PROVIDE[D] MEDICAID SERVICE." *Id.* at 5.

{¶ 6} An administrative and billing assistant who worked in the Caritas office testified next. (Tr. Vol. I at 53-54.) Kpoto, she said, was the person who trained her in how to bill Medicaid for Caritas. (Tr. Vol. I at 55.) She also clarified that she did not personally learn or review Medicaid laws or regulations for herself. (Tr. Vol. I at 58.) She testified that Caritas had one wheelchair van that she knew of and that Kpoto was one of three drivers of the van. (Tr. Vol. I at 54.) She said that Kpoto spent most of his time out of the office as a driver. (Tr. Vol. I at 57.) She billed miles and services based on called-in reports from drivers stating what services were provided and to whom. (Tr. Vol. I at 55-57.) She said no additional attendant personnel for the van were ever identified to her. (Tr. Vol. I at 56.)

{¶ 7} A Medicaid recipient, Veda Blake, testified next. (Tr. Vol. I at 62.) Blake testified that she received rides from Kpoto through Caritas approximately three times per

week during 2013-14.  (Tr. Vol. I at 62-64.)  She stated that she did not pay for these rides from he own pocket and assumed that Medicare or Medicaid paid.  *Id.*  She said that her rides were either in a car or a passenger van.  (Tr. Vol. I at 62, 64-65.)  She never rode in a wheelchair van, however, never owned or used a wheelchair, and Kpoto never offered her a wheelchair to use during transport.  (Tr. Vol. I at 63, 65-66.)  She acknowledged that her memory was somewhat inexact and that she was also transported during 2013-14 by a company called Elite Medical Transportation.  (Tr. Vol. I at 66-67.)

{¶ 8}  A second Medicaid recipient, Annie Williams, also testified.  (Tr. Vol. I at 70.)  Williams testified that during 2013-15 she used a walker and a cane, but never a wheelchair.  (Tr. Vol. I at 74, 76.)  She said that during this timeframe, Kpoto often drove her in his personal vehicle, not a wheelchair van.  (Tr. Vol. I at 73-74.)  Like Blake, she also recalled being transported during the same timeframe by Elite Medical Transportation.  (Tr. Vol. I at 71, 76.)

{¶ 9}  The next to last witness was an agent of the Ohio Attorney General's Office who received documentary evidence Kpoto produced according to a subpoena.  (Tr. Vol. I at 78-79, 86-87.)  She testified that, when dropping off the documents, Kpoto remarked something to the effect that he could not say he had done nothing wrong, but that he wanted the chance to make it right.  (Tr. Vol. I at 89.)  The agent was unable to identify Kpoto, however.  (Tr. Vol. I at 89-90.)

{¶ 10} The final witness in the case was the investigator who handled the case for the Ohio Attorney General's Office.  (Tr. Vol. I at 95.)  He testified that he interviewed six of Caritas' Medicaid-recipient clients (of which there were 62, in total), as well as a number of employees of Caritas, and Kpoto himself.  (Tr. Vol. I at 104-07.)  During the course of the investigation, he learned that Caritas had one ambulette vehicle (wheelchair van).  (Tr. Vol. I at 101-02.)  He also learned that three of Caritas' clients, Veda Blake, Annie Williams, and Crystal Chambliss, were regularly transported despite not being in wheelchairs or using wheelchairs.  (Tr. Vol. I at 105-07, 126; Tr. Vol. II at 20.)  The agent then testified that he compiled (in State's Ex. 4) billing records from Medicaid showing what Caritas billed, entries from the Ohio Office of Budget and Management showing what Caritas was paid (State's Ex. 6), copies of checks to Caritas (State's Ex. 10), and copies of bank records showing receipt of such payments by Caritas (State's Exs. 7-9).  (Tr. Vol. II at 10-19.)  From

those records, the agent created a summary document (State's Ex. 15) showing expenses and billing associated with each trip by Blake, Williams, and Chambliss, purportedly taken in a wheelchair van or ambulette. (Tr. Vol. II at 20-33.) The agent acknowledged that Blake told him, during her interview, that she was in a wheelchair during two days, and the agent said he gave credit for these trips in creating his summary. (Tr. Vol. II at 48, 76; State's Ex. 15 at 11-12.) The agent's summary showed in total that Caritas billed the Ohio Department of Medicaid and was paid for $22,081.63 related to wheelchair van transport for Blake, Williams, and Chambliss. (Tr. Vol. II at 33; State's Ex. 15 at 36.)

{¶ 11} The agent admitted that none of the data represents personal observations and that he had not directly observed Kpoto or Caritas transport anyone without a wheelchair. (Tr. Vol. II 46-47.) He also agreed that he did not attempt to obtain corroboration of the admissions by Blake, Williams, and Kpoto that Blake, Williams, and Chambliss did not use wheelchairs. (Tr. Vol. II at 42-46.) He agreed that the payments were to Caritas, not to Kpoto, individually, and that he did not analyze Caritas' expenses and overhead. (Tr. Vol. II at 53-55.) However, he did find evidence, in the form of bank records, that some money from Caritas went to Kpoto, individually, and he testified that Kpoto was the owner of Caritas. (Tr. Vol. I at 99; Tr. Vol. II at 54-55, 73-75.)

{¶ 12} During the agent's testimony, a recording of Kpoto's interview was played. (Tr. Vol. I at 109-14.) The recorded conversation between Kpoto and the interviewing agents makes clear that Kpoto did not understand the preauthorized medical necessity requirement for clients' trips, that he was not obtaining Certificates of Medical Necessity from treating physicians for his clients, and that he was essentially running the medical transport business like a taxi service. (State's Ex. 16 at 6:40-19:07.) On the issue of whether the people he transported were in wheelchairs, Kpoto agreed with the agents that, by law, the people he transported were required to be in a wheelchair, but he drew a distinction between a doctor's requirement that they be in a wheelchair and whether they complied with their doctors' orders and actually used a wheelchair. *Id.* at 1:52-3:15, 19:55-20:14. Kpoto equivocated and was evasive in answering the question, "Did you ever transport someone who was not in a wheelchair?" *Id.* at 20:43-22:50. The only specific person Kpoto admitted he transported without the use of a wheelchair was Chambliss. *Id.* at 34:01-34:15,

36:31-36:43, 39:20-39:30.  Kpoto confirmed, however, that he did most of the driving for Caritas.  *Id.* at 20:12-20:43.

{¶ 13}  The jury found Caritas and Kpoto guilty of all charged offenses.  (Tr. Vol. II 168-72.)  As a prelude to sentencing, the trial court found that the theft and fraud charges were allied offenses requiring merger into a single conviction for the purposes of sentencing, and the State elected to proceed on the Medicaid fraud count.  (July 12, 2019 Sentencing Tr. at 2-3, filed Sept. 9, 2019.)  The defense informed the trial court that Caritas had ceased to operate as an entity and the State did not dispute the statement.  *Id.* at 4.  The trial court imposed three years of community control on Kpoto.  *Id.* at 6-8; July 12, 2019 Jgmt. Entry 18CR-1837 at 1.  Although the court made no separate oral mention of the now-defunct Caritas, by subsequent entry the trial court imposed the same sentence on the company.  (July 12, 2019 Sentencing Tr. at 6-8; July 12, 2019 Jgmt. Entry 18CR-1839 at 1.)

{¶ 14}  Kpoto now appeals in case No. 19AP-492.  Caritas also appeals in case No. 19AP-519.

## II. ASSIGNMENT OF ERROR

{¶ 15}  Kpoto and Caritas have filed identical briefs, each alleging a single assignment of error:

> THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  DISCUSSION

{¶ 16}  The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different. ' "  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990). In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 17} In contrast, sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's* at 1433. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 18} The Ohio Revised Code section defining the offense of Medicaid fraud provides, "[n]o person shall knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the medicaid program." R.C. 2913.40(B).

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make

inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B). Caritas can also be held criminally liable, "[i]f, acting with the kind of culpability otherwise required for the commission of the offense, its commission was authorized, requested, commanded, tolerated, or performed by the board of directors, trustees, partners, or by a high managerial officer, agent, or employee acting in behalf of the organization and within the scope of such a board's or person's office or employment." R.C. 2901.23(A)(4).

{¶ 19} Under relevant Ohio Administrative Code provisions in effect during the relevant time period, a provider of transport via ambulette (or wheelchair van) could only seek reimbursement for transporting individuals if, among other requirements, the individuals were "actually transported in a wheel chair" and the ambulette service was medically necessary because the individuals to be transported had been certified by an attending practitioner to be nonambulatory. Former Ohio Adm.Code 5160-15-03(B)(2)(a) and (e).[2] Additional billing, such as for an attendant's services was appropriate and permissible, "only when the safe transportation of the patient requires additional handling, such as due to unusual patient obesity, or the need to negotiate a minimal number of accessible steps." Former Ohio Adm.Code 5160-15-03(B)(2)(f).

{¶ 20} The testimony by the investigating agent in the case and the records he compiled show that Caritas billed and was paid for a very large number of wheelchair van trips for Blake, Williams, and Chambliss, at a total cost to the Ohio Department of Medicaid of $22,081.63. (Tr. Vol. II at 20-33; State's Ex. 15 at 36, in passim.) Kpoto was the owner of Caritas. (Tr. Vol. I at 99.) *See also, e.g.,* State's Ex. 11 at 1 (Kpoto self-identifying as the owner, president, and CEO of Caritas). Kpoto trained the person who did the billing for Caritas. (Tr. Vol. I at 55.) The person who did the billing for Caritas billed what the drivers reported to her. (Tr. Vol. I at 55-57.) Kpoto, by his own admission, drove most of the routes billed by Caritas. (State's Ex. 16 at 20:12-20:43.) In addition, Kpoto, by his own admission, knew quite well that he could not legally charge Medicaid for wheelchair van transport for someone who was not in a wheelchair. *Id.* at 19:55-20:14; State's Ex. 11 at 5. Yet, Blake and

---

[2] Former Ohio Adm.Code 5160-15-03 became effective March 27, 2006 and was rescinded effective April 1, 2016. Though former Ohio Adm.Code 5160-15-03 has been rescinded, analogous requirements are now found in Ohio Adm.Code 5160-15-22(B).

Williams testified that, although Kpoto drove them frequently, they were not transported in wheelchairs and never owned wheelchairs. (Tr. Vol. I at 62-66, 73-76.) With respect to Chambliss, Kpoto himself admitted, during his interview with agents from the Ohio Attorney General's Office, that "most times" he transported her without a wheelchair. (State's Ex. 16 at 33:58-34:15.)

{¶ 21} The manifest weight of this evidence is to the effect that Kpoto, owner, president, and CEO of Caritas, knew that he was required to transport his passengers in a wheelchair, knew he was not doing so, and either actually knew that Caritas was billing these trips as wheelchair van trips or at least believed that was so and, as the chief owner and operator of Caritas, failed to carry out his responsibilities under the law to ensure Caritas was operating lawfully. *See* R.C. 2913.40(B); R.C. 2901.22(B); former Ohio Adm.Code 5160-15-03(B)(2)(e). While the witnesses showed uncertainty about the fact that they were also transported by Elite Medical Transportation during the time in question that Kpoto engaged in Medicaid fraud, and even given Kpoto's somewhat evasive and equivocating responses during the investigative interview, we find no indication that "the jury clearly lost its way and created [] a manifest miscarriage of justice" in finding Kpoto and Caritas guilty. (Internal quotations and citations omitted.) *Thompkins* at 387. "[V]iewing the evidence in a light most favorable to the prosecution," we also find this evidence is easily sufficient for a rational trier to have "found the essential elements of the crime proven beyond a reasonable doubt." (Internal quotations and citations omitted.) *Monroe* at ¶ 47. We accordingly overrule Kpoto's and Caritas' assignment of error.

## IV. CONCLUSION

{¶ 22} The evidence showed that Kpoto, owner, president, and CEO of Caritas, knew that he was required to transport his passengers in a wheelchair, knew that (at least in some cases and for some clients) he was not doing so, and either actually knew that Caritas was billing these trips as wheelchair van trips or at least believed that was so and failed to carry out his responsibilities under the law to ensure Caritas was operating lawfully. Kpoto's conviction and his company's conviction for Medicaid fraud are supported by sufficient evidence and not against the manifest weight of the evidence. We overrule Kpoto's and

Caritas' identical assignments of error and affirm both judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

KLATT and NELSON, JJ., concur.

———————————