[Cite as *State v. Magan*, 2026-Ohio-1466.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

        Plaintiff-Appellee,               :
                                                                            No. 25AP-306
                                                                    (M.C. No. 2024 CRB 4937)

v.                                                          :               (REGULAR CALENDAR)

Sabestian A. Magan,                             :

        Defendant-Appellant.            :

---

D E C I S I O N

Rendered on April 23, 2026

---

**On brief:** *Zachary M. Klein*, City Attorney, *Melanie R. Tobias-Hunter*, and *Dave Pelletier*, for appellee. **Argued:** *Dave Pelletier*.

**On brief:** *Blake Law Firm Co., LLC*, and *Dustin M. Blake*, for appellant. **Argued:** *Dustin M. Blake*.

---

APPEAL from the Franklin County Municipal Court

EDELSTEIN, J.

{¶ 1} Following a bench trial, defendant-appellant, Sabestian A. Magan, was found guilty of assault and domestic violence. Mr. Magan now appeals from the February 25, 2025 judgment of conviction entered by the Franklin County Municipal Court. He argues his conviction is not supported by sufficient evidence and was against the manifest weight of the evidence. Mr. Magan also argues ineffective assistance of counsel caused him to reject a plea bargain offered by plaintiff-appellee, the State of Ohio. For the following reasons, we affirm.

## I.  FACTS AND PROCEDURAL BACKGROUND

{¶ 2} On March 25, 2024, Mr. Magan was charged with assault, domestic violence, and unlawful restraint, all misdemeanor offenses, by officer complaint filed in the Franklin

County Municipal Court. All offenses involved an altercation with N.P., Mr. Magan's live-in romantic partner and the mother of his three children, on March 25, 2024.

{¶ 3} Mr. Magan voluntarily waived his right to a jury trial and elected to be tried by the trial court. His bench trial commenced on February 25, 2025. As described below, the state presented testimony from N.P. and her sister, H.K., and Mr. Magan exercised his right to testify on his own behalf. Following the presentation of all testimony and evidence, the trial court found Mr. Magan guilty of assault and domestic violence, both first-degree misdemeanor offenses, but not guilty of unlawful restraint. At Mr. Magan's request, the trial court proceeded immediately to sentencing. Because the domestic violence and assault counts stemmed from the same conduct, they merged for purposes of conviction and sentencing. *See, e.g.*, R.C. 2941.25(A); *State v. Johnson*, 2019-Ohio-4265, ¶ 9-14 (10th Dist.). The state elected to proceed on the domestic violence count. (Feb. 25, 2025 Tr. at 95.) After hearing arguments from counsel and permitting Mr. Magan to speak, the court imposed a 180-day jail sentence, awarded credit for two days of time served in jail pending trial, and suspended the remaining 178 days for two years of non-reporting probation. As a condition of probation, Mr. Magan was ordered to stay away from N.P., subject to any orders entered in the parties' pending custody dispute. (Tr. at 98-99; Feb. 25, 2025 Sentence Entry.)

{¶ 4} Mr. Magan's conviction and sentence were memorialized in the court's February 25, 2025 judgment entry. Mr. Magan now appeals from that judgment and raises the following three assignments of error for our review:

> [I.] THE TRIAL COURT'S VERDICT FINDING THE DEFENDANT GUILTY OF DOMESTIC VIOLENCE AND ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [II.] THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN CONVICTIONS FOR DOMESTIC VIOLENCE AND ASSAULT.
>
> [III.] TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHICH CAUSED THE [MR. MAGAN] TO REJECT A FAVORABLE PLEA BARGAIN OFFERED BY THE STATE.

{¶ 5}   Mr. Magan attributes error to a range of legal matters, so the relevant facts are summarized within our analysis of each assignment of error below.

## II.  ANALYSIS

{¶ 6}   For ease of discussion and in the interest of clarity, we address Mr. Magan's three assignments of error out of order.  First, we consider the ineffective assistance of counsel claim raised in Mr. Magan's third assignment of error.  Then we review the sufficiency and weight of the evidence supporting the trial court's determination of guilt as to the domestic violence and assault offenses and its judgment entering a conviction against Mr. Magan, as challenged in Mr. Magan's first and second assignments of error.

### A.  Third Assignment of Error: Ineffective Assistance of Counsel

{¶ 7}   In his third assignment of error, Mr. Magan alleges an ineffective assistance of counsel claim based on his rejection of a plea bargain offered by the state prior to trial. However, because he fails to establish he was prejudiced by trial counsel's allegedly deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), we find no merit to his claim, as explained below.

### 1.  Controlling Law and Standard of Review

{¶ 8}   A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or objectively unreasonable, as determined by " 'prevailing professional norms,' " and (2) counsel's deficient performance prejudiced the defendant.  *State v. Spaulding*, 2016-Ohio-8126, ¶ 77, quoting *Strickland* at 694.

{¶ 9}   To show trial counsel's performance was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment.  *Strickland* at 689.  Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance.  *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998).  Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel.  *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991).  Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client.  *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 10} Prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley* at 142, quoting *Strickland*, 466 U.S. at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

{¶ 11} A criminal defendant is entitled to the effective assistance of counsel during all critical stages of the criminal proceedings, including plea negotiations. *See, e.g., Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *Missouri v. Frye*, 566 U.S. 134, 142-44 (2012). Counsel has a duty to communicate the terms of any formal plea offers from the state to his client. *State v. McKelton*, 2016-Ohio-5735, ¶ 302; *Frye* at 145-46. Prejudice may arise under *Strickland* if trial counsel's deficient performance caused the defendant to reject a plea deal that would have resulted in a less severe sentence. *McKelton* at ¶ 302, citing *Lafler* at 164. To satisfy the prejudice requirement in such circumstances, a defendant must show that (1) but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances); (2) the court would have accepted its terms; and (3) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. *See, e.g., Lafler* at 164; *Frye* at 147.

{¶ 12} When analyzing an ineffective assistance of counsel claim, an appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. *See also State v. Wade*, 2021-Ohio-4090, ¶ 19 (10th Dist.). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland* at 697. In determining a claim of ineffective assistance of counsel, our review is limited to the record before us. *See State v. Prophet*, 2015-Ohio-4997, ¶ 32 (10th Dist.).

### 2. Analysis

{¶ 13} As the record in this case shows, Mr. Magan's trial counsel communicated the state's plea offer to Mr. Magan prior to trial in conformity with *Frye*. (*See* Tr. at 5-6.) Mr. Magan does not contend on appeal that his defense counsel advised him to reject the plea

offer, nor does the record permit the conclusion that defense counsel gave any advice to reject the plea offer in violation of *Lafler*.

{¶ 14} Prior to the commencement of trial, the trial court informed Mr. Magan of the potential maximum penalties of all three offenses charged in the indictment. (Tr. at 4-5.) The state also informed the trial court of the plea offer it had extended to Mr. Magan: in exchange for Mr. Magan's guilty plea to one count of the lesser-included offense of disorderly conduct (a misdemeanor of the fourth degree under the Columbus City Code) and a joint sentencing recommendation of two years of non-reporting community control with conditions (no acts of violence and compliance with a no-contact order), the state would move to dismiss the remaining pending charges. (Tr. at 5.) Mr. Magan's trial counsel confirmed he had communicated that offer to Mr. Magan, and Mr. Magan affirmed his intention to reject the state's plea offer and proceed to trial:

> [DEFENSE COUNSEL]: . . . I would like to just make a record on that. [The prosecutor] is a polished, intelligent prosecuting attorney who's prosecuted hundreds of these cases. We understand that when he gives that offer, ***it is certainly a clear reduction***. It doesn't -- I want to explain this on the record also to my client -- ***It does not include any behavior that's assaultive in nature. [The state is] not asking for any reporting probation, and I have discussed this with my client at length.*** And while that seems like a good offer, it would be a good offer if my client were guilty, but he's not guilty of any of these offenses, so ***he has decided -- And do you agree with me that you're not taking any offer of any kind; is that right?***
>
> [MR. MAGAN]: Yes. Yes, Your Honor.

(Emphasis added.) (Tr. at 5-6.)

{¶ 15} On appeal, Mr. Magan alleges his trial counsel failed to adequately advise him regarding "the strength of the evidence, the risks of trial, and the comparative sentencing exposure." (Appellant's Brief at 9.) In support, Mr. Magan points out that the transcript contains "no record of discussion regarding sentencing ranges, trial risks, or the State's evidentiary weaknesses," thus constituting deficient performance. (Appellant's Brief at 9.)

{¶ 16} However, as already described, the record confirms the trial court informed Mr. Magan of the maximum potential consequences he could face if found guilty of the

three offenses charged in the indictment. Mr. Magan was also aware of the state's intention to seek non-reporting probation, with conditions, as part of the offered plea bargain. Defense counsel indicated he had discussed the offer "at length" with Mr. Magan, and it is expected that such conversation would not be transcribed given the confidential nature of attorney-client communications. (*See* Tr. at 6.) Further, even on the record, defense counsel emphasized the offer was "certainly a clear reduction," did "not include any behavior that's assaultive in nature," and would not require Mr. Magan to be on reporting probation. (Tr. at 5-6.) To the extent Mr. Magan believes the trial court should have engaged in a further dialogue to confirm he understood the plea offer, appreciated the difference in the potential penalties he might receive, was advised of the benefits and consequences of accepting the offer, was satisfied with the advice of counsel, and was formally rejecting the plea offer, he has not argued as much on appeal.

{¶ 17} In any event, even assuming defense counsel engaged in deficient performance by failing to ensure the trial court engaged in such dialogue, Mr. Magan has not demonstrated resulting prejudice. *See, e.g.*, *State v. Sowell*, 2016-Ohio-8025, ¶ 138.

{¶ 18} Mr. Magan argues he was prejudiced by his trial counsel's deficient performance because "the plea offered a lower misdemeanor with non-reporting community control, an outcome drastically more favorable than two first-degree misdemeanor" offenses. (Appellant's Brief at 10.) But, as just discussed, the record shows Mr. Magan knew this when he rejected the state's plea offer. (*See* Tr. at 4-6.) Suffice it to say, we do not find this argument compelling.

{¶ 19} Mr. Magan also maintains that "[p]rejudice is clear on this record" based on an excerpted statement made by trial counsel during sentencing: "In hindsight, it was probably better for him to have taken the offer . . . I think just because he exercised his rights, shouldn't mean he's punished." (Appellant's Brief at 10, quoting Tr. at 98.) We believe Mr. Magan misunderstands the context within which this statement was made.

{¶ 20} During sentencing, the state asked the trial court to place Mr. Magan "on two years of **community control**" with "a No-Contact Order, a **counseling assessment and follow up**, and no acts of violence as conditions" of his probation. (Emphasis added.) (Tr. at 95.) In addressing the state's sentencing request, Mr. Magan's trial counsel argued:

> I don't think anything has really changed since the [pretrial plea] offer. In hindsight, it was probably better for [Mr. Magan] to have taken the offer, ***but I think two years non-reporting [probation] is reasonable. I didn't hear whether [the trial prosecutor] said [the probation the state was requesting] was reporting or not***. I think just because [Mr. Magan] exercised his rights, shouldn't mean he's punished. Thank you for hearing me out.

(Emphasis added.) (Tr. at 98.) Based on this statement, Mr. Magan's trial counsel understood the state to be asking the court to impose ***reporting*** probation as part of Mr. Magan's sentence. Had Mr. Magan accepted the state's plea offer, however, the state indicated it would ask for ***non-reporting*** probation with "no acts of violence and compl[iance] with a No-Contact Order" ordered as conditions but "**[*n*]*o counseling assessment***." (Emphasis added.) (Tr. at 5.) Understood in this context, we find no merit to Mr. Magan's contention that his trial counsel's statement at sentencing—which actually pertained to the change in the state's position on the type of probation Mr. Magan should be sentenced to—was an "admission" demonstrating that his trial counsel's "earlier advice was not grounded in a reasoned cost-benefit analysis but in misplaced confidence." (Appellant's Brief at 10.)

{¶ 21} Notably, Mr. Magan has not actually argued that, but for the deficient performance of his trial counsel, he would have accepted the state's plea offer. Even still, any such claim would be belied by Mr. Magan's statement to the court prior to trial. After defense counsel endorsed the state's description of the plea offer, confirmed he had discussed the offer with Mr. Magan, and emphasized why he believed it was a "good offer," Mr. Magan's trial counsel told the court Mr. Magan was "***not taking any offer of any kind***." (Emphasis added.) (Tr. at 5-6.) Mr. Magan agreed with trial counsel's presentation of his intention to reject ***any*** offer made by the state. (Tr. at 6.) Again, to the extent Mr. Magan believes the trial court should have conducted a more robust inquiry to confirm he understood the plea offer, appreciated the difference in the potential penalties he might receive, was advised of the benefits and consequences of accepting the offer, was satisfied with the advice of counsel, and was formally rejecting the plea offer, that issue is not before us on appeal.

{¶ 22} Based on the foregoing, we do not find Mr. Magan has demonstrated a reasonable probability that he would have accepted the plea offer prior to trial but for trial counsel's conduct. Ineffective assistance of counsel only lies if, "but for counsel's errors, the outcome of the proceeding would have been different." *Sowell*, 2016-Ohio-8025, at ¶ 138. Because Mr. Magan has not shown that he sustained prejudice as a result of the actions of his counsel, he is unable to demonstrate he received ineffective assistance of trial counsel under *Strickland*. Accordingly, we overrule Mr. Magan's third assignment of error.

### B. First and Second Assignments of Error: Insufficient Evidence and Manifest Weight

{¶ 23} In his first assignment of error, Mr. Magan contends his conviction is against the manifest weight of the evidence. And in his second assignment of error, Mr. Magan argues the evidence presented at trial was insufficient to find him guilty of domestic violence and assault. For the following reasons, we disagree.

### 1. Legal Standard and Standard of Review

{¶ 24} Whether evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial. *See, e.g., State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 25} In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense. *See State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), quoting *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 26} In contrast, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See, e.g., State v.*

*Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). " '[W]eight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other.' " *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 27} When considering an appellant's claim that a conviction following a bench trial is against the manifest weight of the evidence, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See, e.g.*, *Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10 (10th Dist.); *Eastley* at ¶ 20; *Thompkins* at 387; *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶ 28} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g.*, *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 2021-Ohio-3803, ¶ 64 (10th Dist.), citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 2012-Ohio-1017, ¶ 31 (10th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 29} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

## 2. Analysis

{¶ 30} Mr. Magan argues the trial court's findings of guilt as to the domestic violence and assault counts are not supported by sufficient evidence. In the alternative, he contends his convictions are against the manifest weight of the evidence. We disagree.

### a. Domestic Violence

{¶ 31} For the trial court to find Mr. Magan guilty of domestic violence, the state had to prove Mr. Magan knowingly caused or attempted to cause physical harm to a family or household member. R.C. 2919.25(A). In the context of a domestic violence offense, a "family or household member" is statutorily defined to include a person living as a spouse of the offender who is residing or has resided with the offender, R.C. 2919.25(F)(1)(a)(i), as well as a person who is "[t]he natural parent of any child of whom the offender is the other natural parent or is the putative[1] other natural parent," R.C. 2919.25(F)(1)(b).

{¶ 32} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). In the absence of a defendant's admission, resolution of whether an individual acts knowingly must be determined from all the surrounding facts and circumstances. *State v. Fielding*, 2014-Ohio-3105, ¶ 51 (10th Dist.); *State v. Henry*, 2018-Ohio-1128, ¶ 51 (10th Dist.). Thus, the test is subjective but usually is decided on objective criteria. *See State v. Perry*, 2025-Ohio-2054, ¶ 68 (10th Dist.). "Additionally, a defendant acts knowingly, when, although not intending the result, he or she is nevertheless aware that the result will probably occur." *State v. Anderson*, 2010-Ohio-5561, ¶ 13 (10th Dist.), citing *State v. Edwards*, 83 Ohio App.3d 357, 361 (10th Dist. 1992).

{¶ 33} To sustain a conviction for domestic violence, the state was not required to prove that N.P. was ***actually*** harmed, only that Mr. Magan ***attempted*** to cause physical

---

[1] "Putative" is an adjective meaning "commonly accepted or supposed" or "assumed to exist or to have existed." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/putative (accessed Apr. 22, 2026) [https://perma.cc/ZXC8-J3QW]. *See also* Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/putative (accessed Apr. 22, 2026) [https://perma.cc/2NCK-NJ54] (defining "putative" as "generally thought to be or to exist, even if this may not really be true").

harm to her. *See* R.C. 2903.13(A). R.C. 2901.01(A)(3) defines "physical harm" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶ 34} In this case, it is undisputed Mr. Magan and N.P. were living together as a married couple (though they were not legally married) on March 25, 2024 and shared three children together. (Tr. at 14-16, 56-57, 70-71, 80-82.) And, on appeal, Mr. Magan does not contend N.P. was not a "family or household member" as defined in R.C. 2919.25(F). Instead, Mr. Magan challenges the sufficiency and weight of the evidence supporting the "physical harm" element of the domestic violence offense. As to the issue of whether Mr. Magan knowingly caused or attempted to cause physical harm to N.P., the parties presented the following testimony and evidence at trial.

{¶ 35} N.P. testified that on March 25, 2024, she and Mr. Magan were sleeping in the same bed when he woke her up at approximately 6:30 a.m. and started screaming at her about a disagreement they had the night before. (Tr. at 16-17, 31.) Specifically, Mr. Magan was still upset N.P. was unable to recall the password to a television streaming service account. (*See* Tr. at 17, 31.) Detecting a tone in Mr. Magan's voice that suggested to her the situation was "escalating quickly"—and with their young children in mind—N.P. asked Mr. Magan to lower his voice and attempted to leave the bedroom. (*See* Tr. at 17-18.)

{¶ 36} According to N.P., Mr. Magan began yelling louder and "came up behind [N.P.], removed [her] hands from the door forcibly[,] and threw [N.P.] to the ground on [her] tailbone," causing her to experience "excruciating pain." (Tr. at 18-19.) While still on the ground, N.P. scooted towards the door to leave but was stopped by Mr. Magan. (Tr. at 19-20.) N.P. testified Mr. Magan got on top of her, pinned her down by pressing his knee on the back of her arm, and closed their bedroom door. (*See* Tr. at 19-21.) N.P. was eventually able to hoist herself up onto the bed but, despite Mr. Magan's continued screaming, did not leave the bedroom because she was "too afraid." (Tr. at 20-22.)

{¶ 37} The altercation ended when their son knocked on the door to ask for assistance with the television. (Tr. at 22-25. *See also* Tr. at 79.) Mr. Magan opened the door for him and permitted N.P. to leave the bedroom with her phone, which she explained served as the remote to their television. (*See* Tr. at 22-25.) She testified Mr. Magan left for work by at least 9:30 a.m., while N.P., who is a stay-at-home mother, remained at home. (Tr. at 25, 41-42, 72.)

{¶ 38} After Mr. Magan left, N.P. observed a bruise on the back of her upper left arm and confirmed it was not there before the altercation she had with Mr. Magan that morning. (Tr. at 26-27.) She described that area of her body feeling "like a burning, almost like [she] had been cut." (Tr. at 26.) N.P. took photographs of her injury and sent them to a friend around 9:54 a.m., which were presented at trial and admitted without objection as State's Exhibit 1. (Tr. at 6, 27-28.) N.P. also called her sister, H.K., later that morning and told her about the altercation. (Tr. at 25-26, 42-43, 57-58.) At trial, H.K. described N.P.'s demeanor during that call: "Instantly I heard fear. Her voice was very broken. She was crying. So it took a while for her to get everything out." (Tr. at 57-58.) H.K. testified N.P. told her Mr. Magan "had held her down -- knocked her to the floor, held her down with his knee on her arm to where she couldn't get up." (Tr. at 62. *See also* Tr. at 57.) H.K. also recounted N.P. saying "her arm was black and blue," "her tailbone was very sore," and "she was in a lot of pain from the hit to the floor." (Tr. at 62.)

{¶ 39} H.K. called 9-1-1 to report Mr. Magan's assault on N.P. at 11:56 a.m. that same day. (Tr. at 63-65. *See also* Tr. at 58-59.) H.K. testified she "insisted on calling the police" and stayed on the phone with N.P. until they arrived. (Tr. at 58-59, 63-64.) Medics and police officers responded to N.P.'s home shortly thereafter. (*See* Tr. at 29, 50-51.) N.P. was treated at the scene for her injuries but declined transport to the hospital. (Def.'s Ex. A.) At 2:45 p.m., officers filed a criminal complaint against Mr. Magan in the Franklin County Municipal Court and obtained a warrant for his arrest. (Def.'s Ex. A.) H.K. came to N.P.'s home around 7:00 p.m. that same evening, where she described seeing N.P. "in a lot of pain" and her arm "swollen and completely black and blue." (Tr. at 59-60.)

{¶ 40} In his trial testimony, Mr. Magan provided a very different account. He categorically denied assaulting N.P. on March 25, 2024. (Tr. at 70.) Mr. Magan admitted he argued with N.P. the night before concerning their television streaming service. (Tr. at 72-73.) More generally, Mr. Magan testified about issues he had with N.P.'s spending and explained that N.P.'s purported refusal to give him access to streaming services he paid for was "[the] last straw." (*See* Tr. at 72-73.) Ostensibly, this disagreement caused Mr. Magan to decide he wanted to end his ten-year relationship with N.P. (*See* Tr. at 70-73.)

{¶ 41} Mr. Magan testified he woke up around 6:30 a.m. on March 25, 2024 to pray, and after he finished praying, N.P. asked him if he was "done" with their relationship. (Tr.

at 73.)  After confirming he was, Mr. Magan claimed he suggested N.P. find somewhere else to live, offered to pay her rent, and indicated he would permit her to have "open visitation" with their children.  (Tr. at 73-74.)  Mr. Magan claimed N.P. then "got up -- as soon as she got up the -- the bed, she tripped on the -- on the sheet that was on the bed."  (Tr. at 74.)  He attributed N.P.'s fall to coordination difficulties she has due to various health problems.  (*See* Tr. at 74-76, 84-85.)

{¶ 42}  Mr. Magan explained he "got her up" from the floor and then called his brother, who did not testify at trial, because he believed he "was in an uncomfortable situation."  (Tr. at 74.)  Although Mr. Magan categorically denied yelling at or assaulting N.P. in their bedroom on the morning of March 25, 2024, he agreed with N.P.'s testimony about their son knocking on the door and asking for assistance with the television.  (Tr. at 78-79.)

{¶ 43}  Mr. Magan testified that, on his brother's suggestion, he decided to go into work early, and left the home "around 7:49" on March 25, 2024.  (Tr. at 77-78.)  Before he left, Mr. Magan claimed he offered to "call the police for [N.P.], and they can arrive here and [he] can be a witness on myself of exactly what happened if [N.P.] want to make a complaint [about him hitting her]."  (*See* Tr. at 77-78.  *But see* Tr. at 83, 85-86 (Mr. Magan testifying on cross-examination and redirect that he offered to call the police to assist N.P. with leaving the home).)  According to Mr. Magan, N.P. said she was "not attempting or trying to call any police on [him]," was fine with him leaving, and wanted him "to go and make [his] own decision."  (Tr. at 78.)

{¶ 44}  As to the photographic evidence depicting bruising to N.P.'s arm, Mr. Magan maintained the bruise was actually from N.P. falling down and striking her arm on a coffee table a day or two earlier.  (Tr. at 76-77.)  Although Mr. Magan claimed N.P. called and texted him about her fall when it happened, he did not present any evidence corroborating his account of N.P.'s prior injury at trial.  Mr. Magan also alleged he had video cameras installed internally and externally at the home and acknowledged he had control and access to their recorded video footage through an online security portal.  (*See* Tr. at 78, 82-84.)  But Mr. Magan did not present any video footage from those cameras at trial.

{¶ 45}  Viewing this evidence in the light most favorable to the state, as we must on a sufficiency of the evidence review, we find the evidence presented at trial was sufficient

for a rational trier of fact to conclude that, on March 25, 2024, Mr. Magan knowingly caused or attempted to cause physical harm—i.e., "any injury, illness, or other physiological impairment, regardless of its gravity or duration," R.C. 2901.01(A)(3)—to N.P., a family or household member of Mr. Magan.

{¶ 46} Having found no merit to his sufficiency challenge, we next turn to Mr. Magan's contention that his domestic violence conviction was against the manifest weight of the evidence. In support of that challenge, Mr. Magan contends N.P. was not a credible witness. We find Mr. Magan's arguments unavailing, for the following reasons.

{¶ 47} Mr. Magan cites to N.P.'s failure to call the police or seek medical attention as a "strong indicator[] of unreliability." (Appellant's Brief at 6.) Notably, evidence and testimony presented at trial established N.P. told a friend and her sister about the incident shortly after Mr. Magan left the home on March 25, 2024. Further, N.P. was aware that her sister intended to call the police that day. Indeed, evidence at trial showed that, within nine hours of the incident, H.K. called 9-1-1 to report Mr. Magan's conduct (11:56 a.m.), N.P. answered officers' questions when they responded, and Mr. Magan was charged by criminal complaint (2:45 p.m.). We fail to see how this series of events impinges on N.P.'s credibility.

{¶ 48} We likewise find no merit to Mr. Magan's contention that N.P.'s decision not to seek additional medical treatment necessarily undermined the credibility of N.P.'s testimony about her injuries. N.P. testified she suffered physical pain as a result of Mr. Magan knocking her to the ground and holding her down by pressing his knee into her arm. While medical evidence can certainly corroborate testimony and provide additional evidence of physical harm, it is not necessary to sustain a domestic violence conviction. Mr. Magan also suggests N.P.'s testimony about her tailbone injury was not credible because it "was not documented anywhere in the EMT or police reports." (Appellant's Brief at 6, citing Tr. at 34-35, 50-51.) It is true N.P. admitted she did not know whether her tailbone injury was mentioned in medical or police reports. (*See* Appellant's Brief at 3, 6. *See, e.g.*, Tr. at 35-36, 51.) However, because no first responder testified at trial in this case, we have no way of confirming whether the tailbone injury was documented in their reports, much less knowing for certain whether N.P. reported the tailbone injury to first responders on March 25, 2024. In any event, N.P.'s testimony about Mr. Magan pinning her to the ground while

pressing his knee into her upper left arm, alone, established N.P. suffered some injury, irrespective of its gravity or duration. *See* R.C. 2901.01(A)(3).

{¶ 49} Further, we are not persuaded by Mr. Magan's suggestion that some unclear aspects of N.P.'s testimony—e.g., the bedroom door locked versus jammed; N.P. being thrown to the ground versus falling down—support finding N.P. was not a credible witness. (*See* Appellant's Brief at 6.) It is well-established that the finder of fact "may consider conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or otherwise resolving the discrepancies." *State v. Harris*, 2023-Ohio-3994, ¶ 41 (10th Dist.), citing *State v. Taylor*, 2015-Ohio-2490, ¶ 34 (10th Dist.), citing *Midstate Educators Credit Union, Inc. v. Werner*, 2008-Ohio-641, ¶ 28 (10th Dist.). " 'The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact.' " *Petty*, 2017-Ohio-1062, at ¶ 63 (10th Dist.), quoting *State v. Mullins*, 2016-Ohio-8347, ¶ 39 (10th Dist.). *See also State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245, *7 (10th Dist. May 28, 1996) (" 'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' ").

{¶ 50} Even if we accepted as true the purported discrepancies Mr. Magan claims existed in N.P.'s testimony, a defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented." *State v. Rankin*, 2011-Ohio-5131, ¶ 29 (10th Dist.). *See also State v. J.E.C.*, 2013-Ohio-1909, ¶ 42 (10th Dist.). At bottom, we find that none of the minor inconsistences with which Mr. Magan takes issue appreciably bore upon the trial court's determination that the state's evidence credibly proved, beyond a reasonable doubt, Mr. Magan knowingly caused N.P. to suffer some injury, irrespective of its gravity or duration, in violation of the domestic violence statute. *See* R.C. 2901.01(A)(3) (defining "physical harm").

{¶ 51} Mr. Magan also contends N.P.'s testimony was not credible because she had a "personal incentive to portray him as violent" on account of the parties' pending custody dispute—which commenced ***after*** the March 25, 2024 incident. (Appellant's Brief at 6. *See, e.g.*, Tr. at 36-37, 42-49, 52.) To the extent Mr. Magan is suggesting N.P. lied to her

friend, her sister, the police, and medics on March 25, 2024 about being assaulted by Mr. Magan with a future custody dispute in mind, we find nothing in the record to support such claim. While it may be true that Mr. Magan's domestic violence conviction **could** negatively impact his position in the parties' custody matter, we find no basis under the facts and circumstances of this case to conclude that this practical reality undermined the credibility of N.P.'s testimony about being physically harmed by Mr. Magan on March 25, 2024.

{¶ 52} Mr. Magan generally suggests H.K. was not a credible witness either, by virtue of being N.P.'s sister. (*See* Appellant's Brief at 6.) In support, he purports to quote from H.K.'s testimony stating she " 'would always' side with her sister." (Appellant's Brief at 6, quoting Tr. at 66.) However, on review, we find Mr. Magan does not accurately depict what H.K. actually said. The portion of the transcript cited by Mr. Magan contains the following exchange between his trial counsel and H.K. during cross examination:

> [DEFENSE COUNSEL]: And you're saying [N.P.] didn't even ask you to call 911?
>
> [H.K.]: I didn't give her a chance to.
>
> [DEFENSE COUNSEL]: You were looking out for your sister, right?
>
> [H.K.]: Yep. Absolutely.
>
> [DEFENSE COUNSEL]: You're still looking out for your sister?
>
> [H.K.]: Well, of course. Always.
>
> [DEFENSE COUNSEL]: You always -- Understood. No further questions.

(Tr. at 65-66.) And, in fact, H.K. expressly stated she would not lie for her sister during cross-examination. (Tr. at 61.) We find nothing in the record to support any claim that H.K. reported false information to the police or lied under oath at trial.[2]

---

[2] We note Mr. Magan also asserts H.K. was not a credible witness because she "exaggerated [N.P.'s] injuries, describing a 'completely black and blue arm' contradicted by photographs." (Appellant's Brief at 6.) However, we note H.K. did not visit with her sister until 7:00 P.M. that night (Tr. at 59), while N.P. took the photograph of her arm about 20 minutes after Mr. Magan left for work. (*See* Tr. at 27-28; State's Ex. 1.).

{¶ 53}  For these reasons, and based on our review of the record before us, we decline Mr. Magan's invitation to substitute our judgment for that of the trial court, as the finder of fact, concerning N.P.'s credibility or the weight to be afforded her testimony.  The state was only required to prove Mr. Magan knowingly caused or attempted to cause "physical harm," as defined by R.C. 2901.01(A)(3), to N.P. to sustain a domestic violence conviction.  Even ignoring N.P.'s testimony about her tailbone injury, the photographic evidence depicting a bruise on the back of N.P.'s left upper arm (State's Ex. 1; Tr. at 27-29) was consistent with N.P.'s testimony about Mr. Magan pinning her on the ground by pressing his knee against the back of her arm.  (Tr. at 19-20.)  This evidence supports Mr. Magan's domestic violence conviction.

{¶ 54}  We acknowledge Mr. Magan presented a different account of events. However, " 'where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding . . . as being against the manifest weight of the evidence.' "  *In re L.J.*, 2012-Ohio-1414, ¶ 21 (10th Dist.), quoting *In re Johnson*, 2005-Ohio-4389, ¶ 26 (10th Dist.).  The trial court judge, as the trier of fact, was in the best position to consider the discrepancies in the testimony regarding the events that took place on March 25, 2024.  The trial court judge was also in the best position to evaluate the credibility of the live testimony from N.P. in contrast with the live testimony of Mr. Magan.  The trial court judge was likewise free to reject the implication by Mr. Magan's trial counsel that N.P. was not a credible witness or otherwise failed to provide truthful testimony.

{¶ 55}  After reviewing the record and for the reasons set forth above, we cannot say this is one of the rare cases where the trier of fact clearly lost its way in believing N.P.'s testimony when the court found Mr. Magan guilty of domestic violence and entered judgment convicting him of that offense.  Accordingly, we overrule Mr. Magan's challenges to the sufficiency and weight of the evidence in support of his domestic violence conviction.

---

Thus any inconsistencies between the photograph and H.K.'s description could be explained by the passage of time rather than H.K.'s truthfulness.

**b. Assault**

{¶ 56} The trial court also found Mr. Magan guilty of assault, in violation of R.C. 2903.13(A), which prohibits a person from knowingly causing or attempting to cause physical harm to another. As previously discussed, evidence and testimony presented at trial established Mr. Magan knocked N.P. to the ground and pinned her down by pressing his knee into her arm. N.P. testified to experiencing pain as a result. Photographic evidence of a bruise to the back of N.P.'s upper left arm corroborated her account.

{¶ 57} Viewing this evidence in the light most favorable to the state, as we must, we find the evidence was sufficient for a rational trier of fact to conclude that Mr. Magan knowingly caused or attempted to cause injury, irrespective of its gravity or duration, to N.P. *See* R.C. 2901.01(A)(3) (defining "physical harm"). For these reasons, we find the evidence presented at trial was sufficient for the trial court to find Mr. Magan guilty of assault following a bench trial.

{¶ 58} Regarding Mr. Magan's challenge to the manifest weight of the evidence supporting a conviction for assault, Mr. Magan again relies on his own testimony describing a different series of events than those described by N.P. and contends N.P. was not a credible witness. However, our analysis of Mr. Magan's manifest weight challenge is limited to the domestic violence offense. This is because, under R.C. 2941.25(A), Mr. Magan's domestic violence and assault convictions merged for purposes of conviction and sentencing, and the state elected to proceed on the domestic violence count. (*See* Tr. at 95-101.) If we found Mr. Magan's domestic violence conviction to be against the manifest weight of the evidence, however, we would also evaluate the evidence underlying the assault offense. *See, e.g.*, *State v. Stewart*, 2023-Ohio-1493, ¶ 49 (10th Dist.), citing *State v. McKinney*, 2008-Ohio-6522, ¶ 44 (10th Dist.) and *State v. Kpoto*, 2020-Ohio-3866, ¶ 13, 16-21 (10th Dist.). But, having found no basis to conclude Mr. Magan's domestic violence conviction was against the manifest weight of the evidence, analyzing the weight of the evidence supporting the assault offense is not necessary in this case. *See id.*

**c. Disposition**

{¶ 59} Based on the foregoing, we find the trial court's findings of guilt as to the domestic violence and assault counts were supported by sufficient evidence. And we find no basis to conclude Mr. Magan's domestic violence conviction was against the manifest

weight of the evidence. Accordingly, we overrule Mr. Magan's first and second assignments of error.

## III. CONCLUSION

{¶ 60} Having overruled Mr. Magan's three assignments of error, we affirm the February 25, 2025 judgment of the Franklin County Municipal Court.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

————————————